
# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

---

**NOS. 2-08-394-CR**
**2-08-395-CR**

---

GARY SMITH                                                      APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

------------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

------------

## OPINION

------------

Appellant Gary Smith appeals from his convictions and sentences in two trial court cause numbers involving multiple sexual offenses against his daughters Christine and Rhonda.[1]  Appellant brings thirteen points challenging (1) the trial court's alleged failure in each case to require the State to make proper elections and to instruct the jury of the State's "ostensible" elections (points one through six); (2) the trial court's denial of appellant's written motion for continuance (point ten); (3) the

---

[1] ... In accordance with the comment to rule of appellate procedure 9.8, we have used aliases to identify the complainants and family members other than appellant.  *See* Tex. R. App. P. 9.8 cmt.

trial court's admitting evidence of an extraneous assault on Christine and her half-sister in Lubbock (point eleven); (4) the trial court's exclusion of testimony from a CPS investigator (point twelve); (5) the trial court's limiting cross-examination of Rhonda (point thirteen); (6) and the permissibility of imposing life sentences in four of the convictions for sexual assault of Christine under the ex post facto protections of the State and federal constitutions (point nine), or the legal and factual sufficiency of the evidence to support the jury's fact findings supporting the elevation of the punishment range for those offenses from second degree to first degree felonies (points seven and eight). We affirm in part and reverse and remand in part.

## I. Procedural Background[2]

In cause number 2-08-394-CR, the case involving Christine, the jury convicted appellant of one count of indecency with a child and seven counts of sexual assault of a child. Four of the sexual assault counts were alleged to be first degree felonies under penal code section 22.011(f), which provides that the punishment for sexual assault of a child is enhanced from a second degree to a first degree felony if "the victim was a person whom the actor was prohibited from marrying or purporting to marry or with whom the actor was prohibited from living under the appearance of being married under Section 25.01." Tex. Penal Code Ann. § 22.011(f) (Vernon Supp. 2009). In accordance with the jury's assessment of punishment, the trial court

_____

[2] ... We will discuss the factual background of these cases in more detail in our analysis of appellant's first six points.

2

sentenced appellant to twenty years' confinement for the indecency conviction, twenty years' confinement each for three of the sexual assault offenses, and confinement for life for each of the four sexual assault offenses that were charged as first degree felonies. The trial court ordered that all of these sentences be served consecutively.

In cause number 2-09-395-CR, the case involving Rhonda, the jury found appellant guilty of two counts of aggravated sexual assault of a child and two counts of sexual assault of a child. In accordance with the jury's assessment, the trial court sentenced appellant to twenty years' confinement on the sexual assault offenses and confinement for life for the aggravated sexual assault offenses. The trial court also ordered that these sentences be served consecutively, beginning after the sentences imposed in cause number 2-09-394-CR had been completed.

## II. Trial Court's Failure to Inform Jury of State's Elections

In his first six points, appellant contends generally that the trial court erred by failing to inform the jury of the State's election of the specific offenses it would rely on for each of the twelve counts set forth in the indictments. The State concedes

charge error in both cause numbers,[3] but it disputes that appellant was harmed.[4] Accordingly, we will review whether appellant was harmed by the failure to include an instruction incorporating the State's elections and limiting the jury's consideration of extraneous sexual offenses to the purpose of determining the relationship between appellant and his daughters or the state of mind of any of them. *See* Tex. Code Crim. Proc. Ann. art. 38.37, § 2 (Vernon Supp. 2009); *Dixon v. State*, 201 S.W.3d 731, 734 (Tex. Crim. App. 2006); *Rivera v. State*, 233 S.W.3d 403, 406 (Tex. App.—Waco 2007, pet. ref'd).

## A. Standard of Review

We must first determine under what standard to assess harm. Appellant contends that because the jury was not adequately informed of the State's elections, this case is tantamount to a case in which no election was made at all and, thus, that we should use the constitutional harm standard applied in *Phillips v. State*, 193 S.W.3d 904, 913–14 (Tex. 2006); *see Duffey v. State*, No. 05-08-00260-CR, 2009

---

[3] ... When the State elects which of multiple acts it will rely on for conviction, a defendant is entitled to an instruction charging the jury to consider only the elected act in deciding guilt and limiting the jury's consideration of all other unelected acts to the purposes for which they were admitted. *Duffey v. State*, No. 05-08-00260-CR, 2009 WL 2596109, at *2–3 (Tex. App.—Dallas Aug. 25, 2009, no pet.); *Rivera v. State*, 233 S.W.3d 403, 406 (Tex. App.—Waco 2007, pet. ref'd).

[4] ... The State frames the issue thusly: "What is really at issue in this case is not that the State failed to adequately elect the offenses upon which it relied for conviction or that the charge failed to adequately identify the offenses relied upon for conviction. Instead, the issue is that the trial court's instruction on extraneous offenses alone was insufficient to serve as an adequate limiting instruction."

4

WL 2596109, at *3 (Tex. App.—Dallas Aug. 25, 2009, no pet.). The State contends that we should use the *Almanza* egregious harm standard instead because this case involves charge error and appellant did not go far enough in preserving his complaint in the trial court: although appellant objected to the part of the charge indicating that the State is not bound by specific dates, and complained to the trial court, "How is the jury informed of their election?" in the context of discussing the charge, the State claims that appellant should have gone further and requested a specific limiting instruction from the trial court. But *Almanza* requires only a timely objection *or* request to preserve charge error. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). Appellant objected in the trial court on the basis that the State's election was not adequately communicated to the jury in the charge, and the trial court overruled the objection; thus, appellant preserved his complaint about this error. *See* Tex. R. App. P. 33.1(a)(1); *Almanza*, 686 S.W.2d at 171.

Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error. Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 2006); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); *Almanza*, 686 S.W.2d at 171; *see also Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) ("A claim of jury-charge error is reviewed using the procedure set out in *Almanza*."); *Pope v. State*, Nos. 02-08-00235-CR, 02-08-00236-CR, 02-08-00237-CR, 2009 WL 3416459, at *12 (Tex.

5

App.—Fort Worth Oct. 22, 2009, pet. ref'd) (mem. op., not designated for publication) (applying "some harm" standard to trial court's failure to inform jury of election in charge). In other words, a properly preserved error will require reversal as long as the error is not harmless. *Almanza*, 686 S.W.2d at 171. In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.*; *see also Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

## B. The Indictment

In the case involving Christine, the indictment alleged that appellant touched her breast on or about January 15, 2005 when she was under the age of seventeen. The State alleged in Count II that appellant intentionally or knowingly caused Christine's mouth to contact his sexual organ on or about March 15, 2005, and in Count III, the State alleged that on or about May 15, 2005, appellant intentionally or knowingly caused Christine's sexual organ to contact his mouth; the State alleged that both of these counts occurred before Christine turned seventeen. In Counts IV through VIII, the State alleged that appellant intentionally or knowingly caused his sexual organ to contact Christine's sexual organ when she was under seventeen years old on or about the following dates: July 15, 2005 (Count IV), September 15, 2005 (Count V), November 15, 2005 (Count VI), January 15, 2006 (Count VII), and

6

March 15, 2006 (Count VIII).[5] The State further alleged in Counts V through VIII the additional fact that Christine is a person whom appellant is prohibited from marrying, which fact, if proven, would raise the punishment range for the offense from a second degree to a first degree felony. *See* Tex. Penal Code Ann. § 22.011(f).

In the case involving Rhonda, the indictment alleged that appellant penetrated her vaginally on or about July 15, 2003 and on or about January 15, 2004—when she was under fourteen—and that he penetrated her vaginally on or about July 15, 2005 and on or about September 2, 2006—when she was fourteen or older but younger than seventeen.

## C. Voir Dire

During voir dire, one of the prosecutors discussed the State's burden of proof regarding the dates of the offenses alleged in the indictments:

> One of the elements we have to prove is the date when offenses occur. That's a little bit misleading. What the indictments - - the way the indictments read is on or about a certain date. That's misleading.
>
> What the law says is that for these kinds of cases, that creates a ten-year window that starts with the day the case was filed with the courts and then - - so basically the date of the indictment, and then

---

[5] ... Although all of these counts alleged that Christine was under the age of seventeen, she turned seventeen in June 2005, before all of the dates alleged in Counts IV through VIII. However, appellant did not challenge any of the indictment's allegations in the trial court, so he did not preserve this issue. *See Garcia v. State*, 981 S.W.2d 683, 686 (Tex. Crim. App. 1998). Moreover, the purpose of alleging dates in the indictment is to show that the statute of limitations has not yet run; the proof at trial is what matters for determining whether an offense has occurred. *See id.* at 685–86; *see also id.* at 687 (Meyers, J., concurring).

7

goes back ten years, and if we can show that it occurred within that window, we're fine. We have satisfied the "on or about" language.

And so if the indictment says something like on or about July 7th or something, and you go, well, we didn't hear any evidence about July 7th, that's okay as long as we're within that window granted by the law. . . .

Additionally, in the State's opening statement, after discussing abuse that occurred when the family lived in Brownfield, Texas, before they moved to Denton County, one of the prosecutors told the jury:

They eventually moved to Flower Mound, Texas, *which are the cases that he's charged with today*. . . .

. . . .

As you heard, there are eight counts with [Christine]. There could be a thousand. She is going to tell you that it happened over and over and over, and so many times she can't even tell you the dates.

Now, we talked in voir dire a little bit about why we have "on or about" language, and it's usually because kids can't remember two or three separate events. You know, they don't know exactly when it happened. What I anticipate in this trial, it's going to be exactly the opposite. Because it happened so many times, she can't tell you what dates it happened. She can tell you signposts. She will tell you that it happened the summer when I was a freshman in high school, when I was a sophomore, before my birthday, after my birthday. But she's not going to tell you it happened December 15, 2005, because it happened so many times it's just a blur in her mind. [Emphasis added.]

8

Thus, although the State informed the jury that the evidence would reveal voluminous instances of a continuing course of sexual conduct, neither in voir dire nor in its opening statement did the State inform the jury that it would have to choose only a few out of these thousand occurrences on which to actually convict.

## D. Evidence at Trial

### 1. Christine Smith's Testimony

Christine, who was twenty years old at the time of trial, testified that she is appellant's daughter. Christine first testified about abuse that occurred in Brownfield, Texas occurring before she turned fourteen.[6]

#### a. Brownfield, Texas

In Brownfield, Christine lived with appellant, her father; Heather, her mother; her younger brother William; and her younger sister Rhonda. When Christine was around ten or eleven, appellant started paying more attention to her and commenting about her physical appearance, especially the development of her breasts. He told her she was a "really pretty girl." One time Heather went out of town, and appellant said Christine could stay in their bedroom; when Christine rolled over in the bed to go to sleep, appellant "rolled [her] over and he was holding on to [her] and he grabbed - - he grabbed [her] hand and he told [her] that it was okay." He then made her touch his penis. Later, while they were still living in Brownfield, he would make

_____

[6] ... The family moved to Brownfield when Christine was nine and lived there until a couple of days before her fourteenth birthday in June 2002.

9

her have oral sex, vaginal sex, and anal sex with him. This happened "[a] lot, several times," when everyone was asleep or when appellant kept Christine home from school. Christine testified that appellant told her what they did together was "what normal little girls did" and that she was not different from anybody.

### b. Flower Mound, Texas

The family moved from Brownfield to a three-bedroom apartment in Flower Mound, Texas around June 17, 2002, several days before Christine's fourteenth birthday. The prosecutor questioned Christine about the summer the family moved to Flower Mound:

Q. That summer that you moved here, just turned 14 years old, were -- I guess, how long before -- or after you moved here did your dad start doing things with you again?

A. I think it was shortly after we moved.

Q. Was it still in that summer?

A. Yeah.

Q. Tell me about the first time that you remember it happening when you guys moved to the apartment.

A. Whenever we moved, we got -- my sister and I got new mattresses and we had bought a lot of new furniture. And I believe it was a couple nights after we had moved in and he told me that he had wanted to break in -- he wanted to break in my new mattress.

Q. What did he mean?

A. That he wanted to have sex on my new mattress.

Q. Did that happen?

10

A. Yes.

Q. Again, when we talk about sex, what -- again, what body parts touching where?

A. He stuck his penis in my vagina.

Q. When that happened, the breaking in the mattress, where was everybody else?

A. I don't remember.

Q. Starting from that summer, how long did you guys live in that apartment in Flower Mound?

A. Flower Mound, for about three years, I think. We moved -- we moved right before my senior year.

Q. So that would be starting from the summer of 2002 going forward to -- you said right before your senior year so that would be the summer of 2005?

A. Yes.

The indecency with a child offense was alleged in the indictment to have occurred on or about January 15, 2005, and two of the sexual assaults were alleged to have occurred on or about March 15 and May 15, 2005; all of these alleged dates fall during the time the family lived in Flower Mound.

Christine testified that during the three years the family lived in Flower Mound, appellant kept a close eye on her; she was not allowed to do anything other than go to school, but she did participate in band. According to Christine, appellant treated her like his girlfriend. He held her hand in public, took her out on "dates," gave her

11

things that he did not give his other children, and was not as hard on her as the other two. She and her father called each other "Pookie" and wrote each other love notes.

Christine testified that when the family lived in Flower Mound, she and appellant did something "physical," "[s]ometimes every other day, sometimes every day." Appellant would occasionally stop, but only for "a week or two or so." According to Christine, during the three years the family lived in Flower Mound, appellant penetrated her vaginally more than fifty times,[7] penetrated her anally more than fifty times, made her give him oral sex, and performed oral sex on her. Christine also said that during these three years, appellant would touch her breasts with his hands whenever they had sex.

Christine was afraid to tell anyone what was happening because appellant told her he would make her regret doing so, and at least once he told her that he would kill her. She testified to a time that she fought with appellant because she wanted to move out of the house; he physically assaulted her and threatened her.

### c. Argyle, Texas

The family moved from Flower Mound to Argyle[8] shortly after the end of Christine's junior year of high school, in May 2005. Five of the sexual assault counts are alleged in the indictment to have occurred during this time, around July 15,

---

[7] ... Christine testified that appellant used a condom most of the time.

[8] ... Although the house was physically located in the city of Denton, it had a street address in Argyle. Both Argyle and Denton are located in Denton County.

12

September 15, and November 15, 2005, and around January 15 and March 15, 2006.

Christine testified generally that all of the same types of sexual contact with appellant continued to occur in Argyle. She testified to only one specific incident: one day, appellant made Christine give him oral sex in his bedroom. He made a videotape of the encounter, telling Christine he wanted to have something to watch when she was not there.

Christine also testified that when she was working at Albertson's, appellant confronted her store manager Patrick one day and told him Christine would not be coming to work that day. According to Christine, appellant did not like Patrick because he thought Christine was dating him, but she was not.[9]

**d.    In General**

Toward the end of the State's initial direct of Christine, the prosecutor specifically asked her the following:

> Q. Now, before you turned 17, so when you were 14, 15 and 16 years of age, did your dad have his sexual organ, his penis, contact your sexual organ, your vagina?
>
> A. Yes.
>
> Q. And did that happen more than five times?
>
> A. Yes.

---

[9] ... Christine later admitted in front of the jury that she lied about not dating Patrick.

13

Q. Lots and lots of times?

A. Yes.

Q. Before you turned 17 -- 14, 15, 16 years old - - did your dad have his sexual organ contact your mouth?

A. Yes.

Q. Multiple, multiple times?

A. Yes.

Q. And before you turned 17, did your mouth contact his sexual organ?

A. Yes.

Q. Did his mouth contact your sexual organ?

A. Yes.

Q. Did his hand contact your breasts?

A. Yes.

Christine also testified at length about when she left home for good; she called one of her half-sisters[10] who lived in Lubbock and asked her to come to Argyle and pick her up. Christine told her mother but she did not tell appellant; she left him a note. When appellant found out Christine had left, he followed her and her half-sister to Lubbock. He called each of them during the trip, telling Christine to come home and telling her half-sister to give Christine back. He threatened them, and when he got to Lubbock, he chased them in their car, eventually ramming their car

---

[10] ... Christine has four half-sisters, all of whom are appellant's daughters.

14

with his vehicle. Christine and her half-sister called the police, but they eventually signed affidavits of nonprosecution.

### 2. William Smith's Testimony

Christine's brother William testified that Christine and appellant had a closer relationship than appellant did with him or Rhonda. For instance, Christine and appellant spent more time together. Appellant paid a lot of attention to Christine but not to William and Rhonda. Appellant went everywhere Christine went. William testified that Christine's and appellant's relationship was not a regular father/daughter relationship; instead, it was more like a "boyfriend/girlfriend kind of relationship . . . [b]ecause that's the way that they acted." Appellant was always very attached to Christine "in an emotional way."

According to William, appellant and Christine "would go on dates together," eat out, and go to the movies; they were "attached to each other's hip." William and Rhonda wanted to be included in those types of activities, but appellant would put them off. According to William, "There were times where I would come up the stairs and she would be at the doorway and . . . pretty much expose herself to him. And then I would show up and then she would cover herself up." William said this would happen when Christine came out of the shower and appellant went into her bedroom; either she would open up her bathrobe or appellant would be doing it. William said appellant knew that William knew these things were happening.

15

William said appellant said inappropriate things about Christine to him outside their mother's presence, such as "'Doesn't your sister have a nice ass,' or, you know, 'Doesn't she have big boobs,' and stuff like that.'" It made William feel disgusted.[11]

After Christine left home for Lubbock, appellant became emotional and angry; "[h]e would listen to sad songs, [and] he'd lock himself in his bathroom and drink." He listened to one song in particular, "The Best I Ever Had." William thought the song had to do with Christine. More than once after Christine left for Lubbock, appellant told William that he and Christine had been lovers; he said they were going to run away together and have a baby. Appellant told William that he and Christine had had sex "[p]retty much all over." But what appellant said about Christine depended on his mood; sometimes he would call her a slut, and he told William it was the boys against the girls, and the girls would try to accuse the boys of things they had not done. After Christine left, Heather confronted appellant and asked him why he had "raped" Christine; appellant responded that they had been lovers.

According to William, after Christine left for Lubbock, appellant told him, "You remember the time when me and [Christine] would go in there in her room and watch movies, you know, things were happening under the covers." Appellant told William that Christine "would do anything to him if he asked." Appellant told William he preferred Christine over Heather because Christine showed him more attention.

---

[11] ... William also said that appellant had told him that before he could have a girlfriend, appellant "would have to try [her] out."

16

William recounted witnessing an event when the family lived in Flower Mound. He had been hiding behind Heather and appellant's bed to scare his dad, and he saw Christine and appellant. Christine wanted to get a dog, and appellant asked, "What are you going to do for me," and started to push Christine down toward his "private areas." Christine did not say anything; they did not know William was there.

On cross-examination, William explained that appellant told him that he and Christine had had sex in appellant's bed, Christine's bed, Rhonda's bed, William's bed, and the family's couches in their residences. When asked if he meant the houses in both Flower Mound and Argyle, he said, "Yes."

### 3. Rhonda Smith's Testimony

Rhonda testified that she was eighteen at the time of trial.[12] She was thirteen when the family moved to Flower Mound. While they lived in Flower Mound, when Rhonda was in seventh grade, appellant had vaginal intercourse with her in her own bed. He did this at least twice when she was thirteen at the apartment in Flower Mound. At least twice after she had turned fourteen but before she had turned seventeen, he had vaginal intercourse with her at the apartment in Flower Mound. Other than those times, the same thing happened in Flower Mound a "lot more than four." Rhonda explained that the same thing also happened in her bedroom after the family moved to Argyle.

---

[12] ... She was born in 1990.

Rhonda admitted that when a police officer and CPS interviewed her after Christine reported what had happened to her, she denied that appellant had done anything to her. Rhonda said she did not tell about these events when she was first interviewed at the Child Advocacy Center because she was scared of appellant. She and appellant did not really talk about these incidents except that he told her he would kill her if she told anybody.

According to Rhonda, appellant treated her and Christine differently. "He would do everything for [Christine]. [Christine] was like his favorite, and he wouldn't really treat me like I was his daughter. He would treat me like I was some pet or something." He would buy Rhonda things only sometimes; "[i]t was mainly [Christine] that he got everything for." She could not really tell the nature of appellant's and Christine's relationship, though, because she "didn't really see anything."

### 4. Heather Smith's Testimony

Heather Smith, appellant's wife and Christine, Rhonda, and William's mother, testified generally about appellant's relationship with Christine: how he favored her over William and Rhonda, how he noticed and commented on her developing physical appearance, and how he would kiss Christine and hold her in his lap in an inappropriate way. She also corroborated William's testimony that after Christine left for Lubbock, appellant was "very angry" at Christine because she had left. Heather kept asking appellant for a long time afterward why Christine had left and why he

18

was so angry; he finally told her that he and Christine "were in a relationship" and were "lovers." When she reminded appellant that Christine was his daughter, he said that she did not act like one and that they were going to be together. When William wanted to know why Christine had left, Heather had him stand by a window while she asked appellant why he had had sex with Christine. William heard appellant say how Christine was "good" and "better than" Heather.

## E. State's Election

Before resting its case against appellant—outside the jury's presence—the State elected the dates of the offenses upon which it would pursue conviction. The following exchange occurred with regard to the offenses involving Christine:

> MR. PAUL [for the State]: In this instance, the victim, [Christine] indicated that it happened literally hundreds and perhaps up to a thousand times. She indicated that it happened in the apartment when they moved there, the Denton -- Flower Mound apartment -- Denton County Flower Mound apartment, that it happened in the Argyle house.
>
> I asked her specifically on Count I if the defendant had touched her breasts when she was younger than 17 years of age in or around 2005. She indicated, yes, that it happened at least once, if not more times. The time where she indicated that it did happen, we would elect on that to be the allegation in that count.
> I asked her if the defendant caused her mouth to contact his sexual organ when she was under the age of 17 and if that happened in the time frame that we talked about, 2003 to 2006, she indicated yes, on multiple occasions. That would satisfy, and we would elect on Count II and on Count III. That would be our election on II and III. . . .
>
> . . . .

Count II is her mouth contacting the sexual organ of the defendant in 2005 when she was under 17. She indicated yes. So we would elect one of those occasions that she's testified about.

Count III, we're talking about May of '05, caused the sexual organ of [Christine] to contact the mouth of the defendant. I asked her if that had occurred. She indicated, yes, he had performed oral sex on her and that that happened in that time frame and before she turned 17. I asked her specifically in regards to all these allegations if it happened before her 17th birthday, and she indicated yes. So we would elect on one of those occasions for Count III.

Count IV, the allegation is that knowingly caused the sexual organ of [Christine] to contact the defendant's sexual organ, whether he penetrated her with his penis. She indicated, yes, that that happened on multiple, multiple occasions. And I asked her if it happened before the age of 17, while she was still 16 or younger. She indicated yes. We would elect for one of those to satisfy that count.

MR. BORAH [for appellant]: That would be prior to her 16th birthday in 2005?

MR. PAUL: Correct.

MR. BORAH: I believe her birthday is 1989; is that correct? Eighty-eight.

MR. PAUL: Her birthday is in '88.

MR. BORAH: So it would have been prior to her birthday in 2004? You're saying prior to her 16th birthday.

MR. PAUL: Certainly prior to her 17th birthday. I mean, my questions directed to her was did this happen prior to you turning 17, so you were 16, 15 or 14, and she indicated yes.

MR. BORAH: So then that would be 2005 or earlier?

MR. PAUL: Yes. Count V, allegation is causing the sexual organ of [Christine] to contact the sexual organ of the defendant. *Again, we're talking about penetration of the vagina with the defendant's penis prior*

*to the age of 17.* She indicated, again, that that happened on multiple occasions. We would elect one of those to satisfy Count V.

Count VI, again, is an allegation of contacting the sexual organ of [Christine] to contact the sexual organ of the defendant, the same allegation as before. She indicated that that had happened on multiple, multiple occasions younger than the age of 17. We would elect one of those.

Count VII, cause the sexual organ of [Christine] to contact the sexual organ of the defendant, same thing as before in Count VI, prior to the age of 17. We would elect, again, one of those to satisfy that count.

Count VIII, sexual organ of [Christine] contacting sexual organ of defendant prior to the age of 17. She testified that that happened multiple, multiple times, again, satisfying Count VIII.

Those would be our elections in regards to both indictments, Judge. [Emphasis added.]

As for the allegations involving Rhonda, the State elected as follows:

She said that in between the dates of the summer of 2003 and then up to 2006, she had been sexually penetrated by her father, [appellant], on four separate occasions, two of which she was under the age of 14, two of which she was under the age of 17, that she had been penetrated by his sexual organ and her sexual organ. I asked her specifically if there were four separate occasions. She indicated yes. So we will be electing to go forward on those four in regards to that cause.

. . . .

She indicated that it happened in Argyle, but *our election is going to be that the four occurred while she lived in the Flower Mound apartment.* [Emphasis added.]

We agree with the State that these elections are adequate. The elections were general because the complainants' testimony regarding the offenses was general; however, the State did limit the time frame to those events occurring before Christine turned seventeen and when Rhonda was under fourteen and between fourteen and sixteen, to which both girls had testified. Both of their birthdates were in evidence. And the State further limited its elections regarding the offenses against Rhonda specifically to when the family was living in Flower Mound. Thus, we overrule appellant's first and fourth issues claiming that the trial court erred by refusing to require the State to make an adequate election.

## F. The Jury Charges

The jury charge in each case tracked the allegations verbatim from the indictment, along with the "on or about" dates. Also included in each charge are the following paragraphs:

> You are further charged as the law in this case that the state is not required to prove the exact date alleged in the indictment but may prove the offense if any to have been committed at any time prior to the 11th day of October, 2007, the presentment date of the indictment, so long as said offense if any, occurred within ten years of the date of the presentment of the indictment; you are further instructed that the day the indictment was presented and the day of the offense, if any, occurred, shall not be computed within the ten year limitation period.

> You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any other purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may

22

only consider the same in determining the intent of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment or in determining the credibility of any witness, including the defendant, in this case, and for no other purpose.

## G. Closing Argument

During the State's initial closing argument, the prosecutor stated as follows:

> One, the date. I hope you'll recall that we talked about that in voir dire. We are not required to prove a specific date. In a case like this, there is no way you could ever do that, okay? And the law that we talked about, what seems like a year ago, back on I guess it was Monday, about that ten-year window, that's in here and the judge just read that to you in each case, okay? All we have to do is prove that the crimes occurred within that ten-year window and we have satisfied the on or about.

> In fact, if you look at [Christine's] case, you will actually see, if you go back and you do the math, some of the dates and some of the counts are actually after [Christine] was 17. That doesn't matter, okay? What matters is --

> MR. BORAH: Objection. That's a wrong statement of the law, Your Honor.

> MR. CALVERT: That's a precisely correct statement of the law.

> THE COURT: Denied. Overruled.

> MR. BORAH: It's also an argument contrary to the jury charge. The charge says that they have to prove that she was a child younger than 17 years of age then and there on the date that they have alleged.

> THE COURT: Overruled.

> MR. CALVERT: Once again, the law does not require us to prove specific dates. So what matters is the evidence that was presented to you through testimony throughout the course of this trial. *And it was very clear through [Christine] and it was very clear through [Rhonda] that the crimes we're talking about with [Christine] all happened in*

23

*Denton County prior to her 17th birthday. With [Rhonda], some of them happened prior to her 14th birthday, some of them happened -- the rest of them happened prior to her 17th birthday.* So if you go back there and, you know, you're doing the math, that's okay. That ten-year window, that's why that's there.

Also, one of the last things that Tony did was he introduced a statute, the law, okay? It's the Texas bigamy statute, 25.01 of the Penal Code. The reason that's in is on [Christine's] case, there are several counts, I think there is four of them, the way it's worded is you commit a sexual assault and the victim is someone who the actor, the defendant, was prohibited from being married to or holding themself out as married to.

We talked in voir dire about how there's lots of different kinds of sexual assault, lots of different ways to commit sexual assault. That's one of them. That's what he's been charged with. If you're married to one person and you commit a sexual assault against someone other than your wife -- if you're married to this person, by law, you can't be married to this person -- that's a specific type of sexual assault. That's what he's been charged with on four of those counts. That's why that's in there. I wanted y'all to understand that. [Emphasis added.]

## H. Analysis

As the court of criminal appeals has explained,

[R]equiring the State to elect at the close of its evidence forces it to formally differentiate the specific evidence upon which it will rely as proof of the charged offense from evidence of other offenses or misconduct it offers only in an evidentiary capacity. This allows the trial judge to distinguish the evidence which the State is relying on to prove the particular act charged in the indictment from the evidence that the State has introduced for other relevant purposes. Thus, the trial court can instruct the jury on the proper use and weight to accord each type of evidence. Moreover, the election requirement protects fundamental rights such as notice and unanimity, insuring both that the defendant is aware of precisely which act he must defend himself against, and that the jurors know precisely which act they must all agree he is guilty of in order to convict him.

24

*Phillips*, 193 S.W.3d at 910 (footnote ommitted). Judge Cochran has acknowledged the difficulty of applying the election requirements to cases such as these that involve a continuing course of sexual abuse. *See Dixon*, 201 S.W.3d at 736–37 (Cochran, J., concurring).

To determine whether an appellant has been harmed with regard to the failure to elect, the court of criminal appeals has considered how the error impacted the case with respect to four main purposes underlying the election rule: (1) the appellant's need to be protected from the admission of extraneous offenses; (2) the risk that the jury found the appellant guilty of the charged offenses not because they were proven beyond a reasonable doubt but because of the admission of the extraneous offenses; (3) the risk of a nonunanimous verdict; and (4) whether the admission of the extraneous offenses deprived appellant of adequate notice regarding which offense to defend against. *Dixon*, 201 S.W.3d at 734–36; *Phillips*, 193 S.W.3d at 913–14. Accordingly, we will consider these factors in analyzing whether appellant was harmed by the trial court's failure to instruct the jury of the State's elections in our harm analysis.

### 1. Offenses Against Christine Other Than Count II

Christine testified that when the family lived in Flower Mound, appellant touched her breasts whenever they had sex; she also testified to multiple acts of vaginal penetration occurring when she was under seventeen. She said that appellant performed oral sex on her when they lived in Flower Mound, but she did

25

not specify how many times. Other than her recollection that appellant penetrated her vaginally after suggesting they try out her new mattress, all of Christine's testimony regarding the vaginal penetrations—as well as the breast touching—was nonspecific and indistinguishable from the rest of the offenses. *See Duffey*, 2009 WL 2596109, at *6.

As for these offenses—the breast touching, appellant-on-Christine oral sex, and the vaginal penetrations—there is no concern about the admission of extraneous sexual acts; they were admissible under article 38.37, section 2 of the code of criminal procedure to show the relationship between appellant and Christine as well as the state of mind of either of them. *See* Tex. Code Crim. Proc. Ann. art. 38.37, § 2; *Dixon*, 201 S.W.3d at 734–35; *Rivera*, 233 S.W.3d at 406.

As for the second concern, there is little, if any, risk that the jury convicted appellant solely because of the extraneous offenses—if it believed that Christine's testimony regarding a continuing course of conduct involving nonspecific, indistinguishable offenses was credible as to one, the jury must have likewise believed her testimony was credible as to all. *See Dixon*, 201 S.W.3d at 735; *Duffey*, 2009 WL 2596109, at *5. Moreover, Christine's testimony was corroborated generally by her brother's and mother's testimony about what appellant said, and appellant's counsel attacked the credibility of all the family members as a collective unit, on the theory that they were engaged in a conspiracy against appellant.

26

Additionally, there is little risk that the jury failed to return a unanimous verdict as to these offenses. Unanimity in this context means that each and every juror agreed that appellant committed the same, single, specific criminal act to convict him of each of the charged offenses. *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). The final sentence of the charge reads: "It is the Presiding Juror's duty to preside at your deliberations, vote with you, and when you have unanimously agreed upon a verdict, to certify to your verdict by using the appropriate form, and signing the same as Presiding Juror." Although the charge did not inform the jury that they had to unanimously agree on specific acts in order to convict on each count, it did notify the jury that its verdict had to be unanimous.

As in *Dixon*, the only distinguishing detail about all of these offenses appears to be where each of them occurred—in Christine's bedroom or appellant's. 201 S.W.3d at 735. We perceive no risk of the jury believing only Christine's testimony about vaginal penetrations occurring in one of those rooms as opposed to the other; Heather testified that she was frequently out of the home at work while appellant stayed home with the children, and although there was testimony that Christine and Rhonda shared a room, there is no evidence about what time of day these events occurred or who was around.

As for the timing of each of these offenses, which were alleged to have occurred when Christine was under the age of seventeen, Christine told the jury at the beginning of her testimony that her birthdate is June 20, 1988. She later testified

27

that she moved to Argyle at the end of May 2005. The prosecutor asked her, "So were you sixteen when you guys lived in Argyle?" She answered, "Yeah, yes. I turned 17 shortly after." So the testimony shows that Christine was sixteen for around three weeks while the family lived in Argyle.

However, in closing argument, the prosecutor told the jury that the charged offenses were limited only to offenses occurring when Christine was under seventeen. So there is little, if any, risk that some of the jury voted to convict for acts occurring in Argyle after Christine turned seventeen, while others voted to convict for acts occurring in Flower Mound or Argyle while Christine had not yet turned seventeen.

Finally, we do not believe that appellant was deprived of adequate notice of which offenses to defend against. As we have explained, in a case such as this, which involves complainant testimony of a continuing course of the same type of nonspecific, indistinguishable conduct over a long time period, the issue is typically whether the jury believes the complainant generally or not at all. The State informed appellant twelve days before trial of its intent to introduce the following as extraneous offenses:

> That the Defendant committed the offense of Indecency with a Child and Sexual Assault of a Child, felonies, in Denton County, City of Flower Mound, Texas, and in the City of Argyle, Texas, offense date on or about May 1, 2002 to May 1, 2006. The victim of the offense was [Christine]. The defendant contacted her breasts, vagina, and anus with his hands, mouth, and penis. The defendant also had her . . . contact his penis with her mouth and hands. These offenses occurred

28

continually during that period. The defendant also continually complemented [Christine] on her physical appearance. He also continually discussed matters of a sexual nature with her.

Although Christine testified to incidents occurring in Brownfield, Flower Mound, and Argyle—some of which must have occurred after she turned seventeen—at least by the time of the State's election, appellant's counsel knew that the State was proceeding only on those incidents occurring in Denton County after she had turned fourteen but before she had turned seventeen. State's Exhibit 13, which was admitted during Christine's testimony, is a statement from Christine to Detective Shane Kizer of the Denton Police Department indicating that appellant molested her between 800 and 1000 times over a six or seven year period, including when the family lived in Brownfield, Flower Mound, and Argyle. Accordingly, we do not believe that there is any risk that appellant was inadequately notified of the exact nature of the charges against him such that he could not adequately defend himself.

Having analyzed the four election-error factors set forth by the court of criminal appeals in light of the entire record, we conclude and hold that the trial court's failure to include an adequate limiting instruction did not harm appellant[13] as to Count I and Counts III through VIII in the case involving offenses against Christine (the breast touching, vaginal penetration, and appellant-on-Christine oral sex offenses). *See*

---

[13] ... Even if we were to apply the constitutional harm standard applied in *Duffey*, we would conclude and hold that the error was harmless beyond a reasonable doubt as to those counts. *See* Tex. R. App. 44.2(a); *Williams v. State*, 273 S.W.3d 200, 225 (Tex. Crim. App. 2008).

29

*Dixon*, 201 S.W.3d at 735–36.  We overrule appellant's second and third points complaining about those offenses.

## 2. Count II (Appellant's Making Christine Give Him Oral Sex)

As with the other seven offenses against Christine, an analysis of the first and second factors weighs against harm as to the allegation regarding appellant's making Christine give him oral sex.  However, because Christine testified to a specific incident of oral sex in Argyle, and because William testified that he saw what appeared to be appellant's attempting to force Christine to give him oral sex in Flower Mound, the analysis of the unanimity and notice factors is of more concern as to this offense than with the other offenses.

The prosecutor did not limit the time frame when asking about the videotaped oral sex incident in Argyle; instead, he asked Christine, "Was there a time when you guys lived in Argyle that something happened where he actually videotaped you?"  There is no evidence as to whether Christine had already turned seventeen when this occurred.  So there is a risk that the jury could have convicted for an offense occurring after Christine had already turned seventeen.  Moreover, there is also a risk that some of the jury members could have convicted for this offense based on Christine's general testimony that appellant made her give him oral sex in Flower Mound, her general testimony that appellant made her give him oral sex in Argyle, her specific testimony regarding the videotaped incident in Argyle, or William's testimony regarding appellant's appearing to force Christine to his crotch area when

she said she wanted a dog.  Because the evidence regarding appellant's making Christine give him oral sex included a mixture of specific and general events, there is more of a risk that the jury could have convicted appellant based on different events, and, thus, that the verdict was not unanimous.  Accordingly, we conclude and hold that appellant was harmed as to Count II only.  We sustain appellant's second and third points as to Count II only.

### 3.  Offenses Against Rhonda

Rhonda testified specifically that appellant had vaginal intercourse with her at least twice in Flower Mound when she was under fourteen, and in seventh grade, and at least twice when she was fourteen but not yet seventeen.  She testified more generally that it happened a "lot more than four" times and that the same thing happened after the family moved to Argyle.

For the same reasons set forth above regarding the offenses against Christine, there is no danger that appellant was improperly subjected to the introduction of extraneous sexual offenses against Rhonda, nor that the jury convicted solely on the basis of the admission of those offenses.  As for the third and fourth factors, unanimity and notice, we likewise perceive no risk of harm: Rhonda's testimony was straightforward, general as to the commission of the offenses, and clearly limited to the timeframe during which she was the ages alleged in the indictment.  We conclude and hold that appellant was not harmed as to Counts I

through IV involving offenses alleged against Rhonda. *See Dixon*, 201 S.W.3d at 735–36. We overrule his fifth and sixth points.

### IV. Enhanced Punishment Range for Section 22.011(f) Convictions

In his seventh and eighth points, appellant contends that the evidence was legally and factually insufficient to convict him of violating section 22.011(f) as alleged in Counts V through VIII involving Christine. Alternatively, in his ninth and tenth points, he claims his punishment under those counts is void because it exceeded that allowed by law at the time he committed the offenses and, thus, is in violation of the ex post facto protections of the Texas and United States Constitutions.

Section 22.011(f) provides that an offense under section 22.011(a) is a second degree felony unless "the victim was a person whom the actor was prohibited from marrying or purporting to marry or with whom the actor was prohibited from living under the appearance of being married under section 25.01," the bigamy statute; in the latter case, the offense is a first degree felony. Tex. Penal Code Ann. § 22.011(f). According to appellant, subsection (f) "must be interpreted as requiring that the State prove a defendant was actually committing 'bigamy' as described in 25.01 in order for it to obtain a conviction and allow subsequent punishment as a first-degree felony."

We need not decide the scope of section 22.011(f) or the proof required by it because it was not yet effective when appellant committed the offenses as alleged

32

and proved at trial. Section 22.011(f) took effect September 1, 2005, after Christine had already turned seventeen and therefore also after the commission of the offenses upon which the convictions were based. *See* Act of May 29, 2005, 79th Leg., R.S., ch. 268, §§ 4.02, 5.02, 2005 Tex. Gen. Laws 621,714, 720. Thus, applying section 22.011(f) to increase the punishment for the offenses in Counts V through VIII—which the State alleged and proved were committed *before* Christine turned seventeen—would be an impermissible ex post facto application of that section. *See* U.S. Const. art. I, § 10; Tex. Const. art. I, § 16; *Collins v. Youngblood*, 497 U.S. 37, 45–46 (1990), 110 S. Ct. 2715, 2720–21 (providing that a law that increases punishment after the commission of an offense is an ex post facto law); *Grimes v. State*, 807 S.W.2d 582, 586 (Tex. Crim. App. 1991) (adopting federal ex post facto analysis for Texas constitutional provision); *Ponce v. State*, 89 S.W.3d 110, 117–18 (Tex. App.—Corpus Christi 2002, no pet.); *see also Lindsey v. State*, 672 S.W.2d 892, 894 (Tex. App.—Dallas 1984, pet. ref'd).[14] Accordingly, we conclude and hold that the trial court erred by allowing Counts V through VIII to be

---

[14] The State contends that it also proved Christine's lack of consent to the penetrations in Counts V through VIII such that a conviction for sexual assault based on nonconsensual sex occurring after Christine turned seventeen would have been permissible; in other words, the State contends that it proved that a section 22.011 offense for each count occurred at a time that the elevated punishment range in section 22.011(f) was available. *See* Tex. Penal Code Ann. § 22.011(a)(1)(A). But the State cannot have it both ways; it elected to proceed on Counts V through VIII for acts occurring *before* Christine turned seventeen. Thus, the enhanced punishment range under section 22.011(f) was not available for those counts.

33

enhanced to first degree felonies under section 22.011(f). We sustain appellant's ninth and tenth points.[15]

Appellant contends that we must reverse and acquit on these convictions because the sentence is void. But appellant did not challenge the sufficiency of the evidence of the penetrations alleged in Counts V through VIII, and section 22.011(f) does not define a new offense, only an elevated range of punishment. The appropriate remedy for a sentence outside the range of punishment for an offense is a remand for a new trial on punishment alone. *See* Tex. Code Crim. Proc. Ann. art. 44.29(b) (Vernon Supp. 2009); *State v. Marroquin*, 253 S.W.3d 783, 785 (Tex. App.—Amarillo 2007, no pet.); *Fairrow v. State*, 112 S.W.3d 288, 295 (Tex. App.—Dallas 2003, no pet.). Thus, we must remand these four counts for a new trial on punishment.

## V. Continuance

In his tenth and eleventh points, appellant argues that the trial court abused its discretion by denying his written motion for continuance and by permitting the introduction of extraneous offenses. Included in his eleventh point is a complaint that the State failed to give him reasonable prior notice of its intent to introduce extraneous offenses. Appellant complains about two extraneous offenses

---

[15] ... Because appellant's ninth and tenth points are dispositive, we need not address appellant's seventh and eighth points. *See* Tex. R. App. P. 47.1; *State v. Iduarte*, 232 S.W.3d 133, 140 (Tex. App.—Fort Worth 2007), *aff'd*, 268 S.W.3d 544 (Tex. Crim. App. 2008).

34

specifically: appellant's assault of Christine and her half-sister by ramming their car after he had chased them to Lubbock—which was admitted at guilt-innocence—and appellant's sexually assaulting one of his daughter's friends when the family lived in Brownfield.

Appellant filed a written motion for continuance in cause number F-2008-01081-B only, the case involving offenses against Rhonda. He argued that the State's providing notice of certain extraneous offenses, including the assault of his daughter's friend, on October 1, 2008—two days before trial was scheduled to start—was unreasonable. The State had provided notice of the Lubbock assault on September 25, 2008; thus, appellant's motion for continuance did not apply to that extraneous offense.

Under the Texas Code of Criminal Procedure, a criminal action may be continued on the sworn, written motion of a defendant, so long as sufficient cause is fully set forth in the motion. Tex. Code Crim. Proc. Ann. art. 29.03, 29.08 (Vernon 2006); *Dotson v. State*, 146 S.W.3d 285, 297 (Tex. App.—Fort Worth 2004, pet. ref'd). Whether to deny a motion for continuance is within the trial court's discretion, and we will not reverse its decision on appeal unless the appellant shows that the court abused its discretion. *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 825 (1997); *Dotson*, 146 S.W.3d at 297. To establish an abuse of discretion, the defendant must show that he was actually prejudiced by counsel's inadequate preparation time. *Janecka*, 937 S.W.2d at 468; *Dotson*, 146

35

S.W.3d at 297. Specific prejudice may include unfair surprise, an inability to effectively cross-examine the State's witnesses, or the inability to adduce crucial testimony that could have been given by potential witnesses. *Janecka*, 937 S.W.2d at 468; *Dotson*, 146 S.W.3d at 297. But a mere statement that counsel did not have enough time to prepare an adequate defense does not demonstrate prejudice. *Janecka*, 937 S.W.2d at 468; *Dotson*, 146 S.W.3d at 297.

Here, appellant contends that he was "unable to investigate this allegation and produce any evidence to contradict" the witness's testimony. He also claims that the State emphasized this evidence by calling him a serial molester during closing argument at punishment.

Appellant's claim that he was unable to investigate and produce any evidence to contradict the witness's testimony is general; it does not point to any specific prejudice and merely posits that appellant did not have time to prepare an adequate defense. The State told the trial court at a pretrial hearing on October 6, 2008 that appellant was made aware of this incident via a videotaped interview of Heather, which the State had allowed appellant access to; the prosecutor also told the trial court,

> I also know that the witnesses who are listed in the 404(b) notice, prior to me filing it, when we made contact with them, they had told us that an investigator was looking for them, that they had gotten phone calls, that their friends and family had gotten phone calls, and it was not our investigator. So that would logically lead us to believe that their investigator was seeking those people and were actively looking for them before we filed the responses.

36

So it was actually in writing on those days [October 1], but it's my belief that the defense knew of these people and had been actively searching for them prior to the actual notice given.

The State did not mention this witness in particular, but appellant acknowledged that Heather mentioned the incident in her statement, which he had reviewed, and that he knew the first name of the witness and that she was a friend of one of appellant's daughters (Christine and Rhonda's half-sister), but that he did not know of the witness's last name until October 1 when the State gave its notice. The witness testified that the first time the State had talked to her was October 1, 2008, the Wednesday of the week before trial, which started Monday, October 6, 2008. Punishment began on Thursday, October 9, 2008.

We conclude and hold that the trial court did not abuse its discretion by denying the continuance because appellant failed to show specific prejudice. *See Janecka*, 937 S.W.2d at 468; *Dotson*, 146 S.W.3d at 297. Moreover, any error would have been harmless in light of the extensive evidence regarding appellant's repeated, "serial" sexual abuse of his own daughters, which is far more inflammatory than the single sexual assault testified to by the witness. *See Montgomery v. State*, 810 S.W.2d 372, 397 (Tex. Crim. App. 1991) (op. on reh'g) (noting that sexual misconduct against children is inflammatory in general). We overrule appellant's tenth point.

Appellant's eleventh point complains that he did not receive reasonable prior notice of the State's intent to introduce evidence of the Lubbock assault at guilt-

37

innocence. He filed his request for the State to give such prior notice in cause number F-2007–2107-B—the case involving offenses against Christine—only. Appellant did not object to the introduction of evidence of this extraneous offense on the same grounds at trial. Instead, he urged that the trial court should first hold a hearing on the admissibility of the offense pursuant to a pretrial motion in limine; he also objected on rule 403 grounds. Accordingly, appellant has failed to preserve this point for our review and we overrule it. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *Clarke v. State*, 270 S.W.3d 573, 580–83 (Tex. Crim. App. 2008).

## VI. Exclusion of Testimony

In his last two points, appellant complains about the trial court's exclusion of testimony.

We review a trial court's evidentiary rulings for abuse of discretion. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Montgomery*, 810 S.W.2d at 391. A trial court abuses its discretion only when the decision lies outside the zone of reasonable disagreement. *Green v. State*, 934 S.W.2d 92, 101–02 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1200 (1997); *Wenger v. State*, 292 S.W.3d 191, 202 (Tex. App.—Fort Worth 2009, no pet.).

In his twelfth point, appellant challenges the trial court's exclusion of testimony from a CPS investigator who observed Rhonda's interview at the Child Advocacy Center. Appellant made an offer of proof in which the CPS investigator testified in

response to questioning from appellant's counsel that she observed Rhonda's body language and answers to questions during the interview; after watching the interview, in which Rhonda denied having been sexually abused by appellant, the investigator ruled out sexual abuse and closed the case. Appellant offered this testimony to rebut the testimony of Detective Kizer—who participated in the interview—that in his opinion, based on Rhonda's body language and gestures during the interview, she was lying when she denied that appellant had done anything to her.

When the State cross-examined the CPS investigator, she admitted that if the child does not make an outcry, then CPS has no reason to believe that sexual abuse has occurred. The State asked her the following:

> Q. Fair to say that you weren't making any kind of legal determination as to whether something happened or didn't happen; simply based on the victim saying it did not happen, you closed your case?
>
> A. Right, because we had no evidence that anything had happened up until that point.

Later, on redirect, she testified again as follows:

> Q. So your determination wasn't simply based upon her denial?
>
> A. Well, any time that a child does not make an outcry, unless there's other people that that child has made an outcry to that we get statements from and things like that, then we have to rule a case out because the child didn't say that anything happened to him or her.

Q.     But your recommendation as to this finding was based on watching the interview, listening to the questions and the answers, watching her body language, talking with Detective Kizer, and talking with Ms. Smith, correct?

A.     Yes.

The investigator never definitively answered whether she would have been able to keep Rhonda's case open if she had determined that Rhonda was lying when she denied that appellant had sexually abused her. The investigator merely stated that she had no evidence at that point on which to keep a CPS case open. Appellant wanted to rebut Detective Kizer's testimony that Rhonda was not being truthful when she denied the sexual abuse in the interview. But as the court stated regarding the investigator's testimony: "what she said was, when somebody says nothing happened to me and we don't have anybody else that she told something happened, then we don't have anything and we can't do anything. . . . We have no collateral sources that the girl told anything differently to." Thus, the investigator's testimony did not directly contradict Detective Kizer's testimony.[16] And as the trial court pointed out in excluding the testimony, Rhonda had already testified before the jury and admitted that she initially denied the sexual abuse but that she was lying when she did so. The jury was in a position to see her testify in person and make a credibility determination at that time. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert.*

---

[16] ... Additionally, Detective Kizer participated directly in the interview with Rhonda; the CPS investigator watched behind a two-way mirror.

40

*denied*, 129 S. Ct. 2075 (2009).  Accordingly, we conclude and hold that the trial court did not abuse its discretion by excluding the evidence.  *See* Tex. R. Evid. 401; *Smith v. State*, 65 S.W.3d 332, 340 (Tex. App.—Waco 2001, no pet.).  We overrule appellant's twelfth point.

In his thirteenth point, appellant contends that the trial court improperly refused to allow him to question Rhonda about her having been hospitalized for "cutting" behavior when the family lived in Flower Mound and about appellant's having signed a waiver allowing her to speak freely with a psychologist about why she was engaging in cutting.  The trial court allowed appellant to make a bill, in which Rhonda testified that when she was fourteen years old and in eighth grade, her basketball coach found out she was cutting herself and told appellant and the school counselor.  Rhonda was hospitalized for about seven to eight days and was treated by a psychologist for some time afterwards.  Rhonda agreed that appellant signed a "waiver so that [she] could have freedom of talking with [the psychologist] about why [she was] cutting" herself and that the waiver said the psychologist "did not have to disclose anything that [Rhonda] told her."

> Appellant argued to the trial court that this testimony was relevant because
>
> part of the State's case here is the idea that my client had some type of ridiculous control of his family.  And if - - it is the argument of the defense that if he did, he would never have agreed to sign a waiver not knowing what his daughter was going to tell . . . the psychologist what the underlying basis was for cutting herself.

Of course, I think at this point that the investigator on the case believed it was because he believes that sexual abuse was going on at the time, and this is the type of stuff that we know kids do when they're going through this type of thing, other things too. But, again, I think it takes away an argument that I have showing my client's lack of control of the situation. I think that is powerful evidence that needs to be presented to this jury in our closing argument.

The State objected to the admission of this testimony on relevance grounds and under rule 404.

Without any evidence as to why Rhonda was cutting, this evidence is of only minimal relevance and could only lead to speculation. Appellant could have been willing to sign the waiver for any number of reasons: because Rhonda was cutting for reasons other than sexual abuse—which does not bear upon the credibility of her testimony that such abuse did occur; because Rhonda was so scared of appellant that he was confident she would deny any sexual abuse to the psychologist—as she initially did to the police, even in light of Christine's allegations; or for other reasons. We conclude and hold that the trial court did not abuse its discretion by excluding this testimony, and we therefore overrule appellant's thirteenth point. *See* Tex. R. Evid. 401; *Woods v. State*, 306 S.W.3d 905, 909–10 (Tex. App.—Beaumont 2010, no pet.).

## Conclusion

Having sustained appellant's second and third points as to Count II only in cause number F-2007-2107-B (the case involving offenses against Christine), we reverse and remand the conviction and sentence for that count for a new trial.

Having also sustained appellant's ninth point as to Counts V through VIII in cause number F-2007-2107-B, we reverse the sentences for all of those counts and remand for a new trial on punishment as to those counts only. Having overruled appellant's remaining points, we affirm the convictions and sentences as to Counts I, III, and IV in cause number F-2007-2107-B and Counts I through IV in cause number F-2008-1081-B (the case involving offenses against Rhonda).

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 27, 2010